CULPEPPER, Judge.
The plaintiffs, Dan A. Ritchey, Jr. and his wife, filed this suit to abate a nuisance and recover damages to their residential premises. Two of the defendants, B & M Materials, Inc. and Zurben Thibodeaux, d/b/a Thibodeaux Shell Yard, operate shell yards on the bank of the Vermilion River opposite plaintiffs’ residence. The other two defendants, Lake Charles Dredging & Towing Company, Inc. and Radcliff Materials, Inc., deliver shells by barge to these shell yards. Plaintiffs contend that the noise and vibrations caused by these operations constitute a nuisance. From an adverse judgment, plaintiffs appealed.
The evidence shows that in 1956 plaintiffs purchased for $5,500 a residential lot, measuring 100 feet front by an average depth of 175 feet, in Bendel Gardens, a beautiful residential subdivision of the City of Lafayette. The rear of the lot borders the Vermillion River, a navigable stream approximately 200 feet in width. During the year 1957, plaintiffs constructed a home, presently valued at about $60,000. Other homes in the subdivision are of comparable value.
At the time plaintiffs purchased their lot in 1956 the land on the opposite side of the river was already being used for commercial and light industrial purposes, including two shell yards. The defendant, Mr. Thi-bodeaux, had started his shell yard about 1954. The yard now owned by the defendant, B & M Materials, Inc., had been in operation very near this same location since about 1948.
Mr. Ritchey testified that when he purchased his lot he knew of the existence of the shell yards and commercial establishments on the other side of the river but did not know that the barges were brought up the river by tugboats at night or that the noise of the entire operation was so annoying. Furthermore, he contends that since 1956 the volume of shells handled by these two yards has increased greatly. The evidence shows that by 1966 the two yards were handling a total of approximately 100,000 cubic yards of shells annually. Barges are unloaded two or three days a week. The average barge load is approximately 1,000 cubic yards.
Mr. Ritchey’s home is located about 60 feet from the river, which means that the *348 barge unloading operations in the river are conducted a distance of 150 to 200 feet from plaintiffs’ home. The operations of reloading the shells onto trucks at the shell piles on the bank of the river are 250 to 300 feet from plaintiffs’ home.
Depending on the heighth of the water in the river, from one to three barges are brought up the river by tugboats, usually at night. The tugboats have large marine engines, powerful search lights and public address systems to give instructions to the crews handling the barges. When they arrive at the shell yards, the barges are positioned by the tug against the bank where they can be unloaded the next morning by a crane with a scoop bucket, mounted on a spud barge.
Although plaintiff and some of his witnesses testified that operations to unload the barges started about 6:00 a.m. and sometimes continued even after hours or darkness, the trial judge found as a fact that the barges were usually unloaded between 7:00 a.m. and 5:00 p.m., except on emergency occasions. The trial judge also found that operations are usually conducted during week days and not on the week end.
The trial judge also found that the reloading of shells onto trucks at the yards if conducted from about 6:30 or 7:00 a. m. until 5:00 or 5:30 p. m., Monday through Friday. A front-end loader is used by one of the yards. Plaintiffs contend this loader is particularly noisy.
Plaintiffs complain about the noises caused by the straining of the tugboat motors, the* motors on the spud barge, the motors of the crane, the squeaking of the cables and pulleys, the banging of the scoop bucket, particularly when it strikes the metal floor of the barge, the noise of the generators of the tugboats, the noise of the shell yard operations caused by the various vehicles which load shell, particularly the noise of the front-end loader, the search lights on the tugboat, the chatter of the tugboat people over the two-way radio, the music which is played on the tugboats and, generally, the noise of the entire operations. Plaintiffs contend the noise constitutes an unreasonable annoyance and inconvenience to the use of their property as a residence and should be enjoined completely.
Several of plaintiffs’ neighbors testified that the noise of the scoop bucket banging against the barge, the screeching of the cables and pulleys, the motors running, etc. is such that they are awakened early in the morning, cannot carry on a conversation in normal tones, cannot use their patios or backyards and can hardly hear their television. The testimony of these witnesses is indeed impressive as to annoyance and inconvenience during the operations complained of.
Plaintiff also made a tape recording of the noise. The district judge permitted its introduction in evidence for the limited purpose of showing the nature of the noise but not the intensity. We have listened to this tape and can readily understand the reason for plaintiffs’ objections to the nature of the noise, regardless of the intensity. Particularly noticeable is the noise when the scoop bucket strikes the bottom of an empty barge.
On the other hand, defendants introduced testimony to show that the equipment used is of the usual type for such operations and that they operate only during hours of daylight, from about 7:00 a. m. to 5:00 p. m., except in emergencies. Also, several witnesses who live in the area testified that they heard the noises but did not consider them to be particularly annoying.
The present suit was filed on August 24, 1964. The evidence shows that a similar suit was filed in 1959 against Thibodeaux Shell Yard and Guarisco Construction Company, which was at the time furnishing shells to Thibodeaux. The 1959 suit ended with letter agreements by defendants stating generally that they would cease operations between 6:00 p. m. and 6:00 a. m., *349 except in emergencies and in no event would operate beyond 9:00 p. m. In the present suit plaintiffs contend the time limits set out in the agreements have not been adhered to.
The applicable articles of our Civil Code[1] provide generally that although the owner of real property may do with it whatever he pleases, he cannot conduct operations which will unreasonably inconvenience his neighbor in the enjoyment of his property.
In discussing the jurisprudence, we deem it appropriate at the outset to point out the distinction between “nuisance per se” and “nuisance in fact”. A nuisance per se is an act, occupation or structure which is a nuisance at all times and under any circumstances, regardless of its location or surroundings, such as a bawdy-house operated in violation of law. A nuisance in fact is one which becomes a nuisance by reason of particular circumstances and surroundings, Hutson v. Continental Oil Company, 136 So.2d 714 (2d Cir.1962); 66 C.J.S. Nuisances § 3, pp. 733-734. In the present case, we are concerned with a nuisance in fact. The operation of these shell barges and shell yards is not a nuisance under all circumstances. Whether it is a nuisance will depend on the facts and circumstances of this particular case.
Our jurisprudence construing the above cited codal articles has. established guidelines for determining whether the operation of a business can be enjoined as a nuisance by the owners of nearby residences. In Irby v. Panama Ice Company, 184 La 1082, 168 So. 306 (1936) the plaintiff sought to enjoin the operation of an ice plant. The court held:
“The locality, the occupation of the inhabitants of the neighborhood, the environment, is what determines whether an establishment which uses necessarily noisy machinery is a nuisance. A manufacturing enterprise that would be a nuisance in one locality might not be so in another. The inhabitants of large cities that are sustained by manufacturing and commercial enterprises must bear the unavoidable discomforts and annoyances thereof. Noises and vibrations from the operation of machinery cannot be a nuisance, subject to injunction, unless they are excessive and unreasonable, depending upon the location of the establishment, its relation to other property, and particularly to other sources of noise or vibration. Olsen v. Tung, 179 La. 760, 155 So. 16; Meyer v. Kemper Ice Co., 180 La. 1037, 158 So. 378.”
Monlezun v. Jahncke Drydocks, Inc., 163 La. 400, 111 So. 886 (1927) is similar to the present case in that plaintiffs there *350 sought to enjoin the operation of a boiler works and foundry near their home on a navigable stream. The court held:
“Plaintiff’s home is located very near the Mississippi river — only about a block and a half from it. In cities and towns on large navigable streams the squares fronting on such streams are to a greater or less degree (and usually to a greater, especially where the part of the stream on which the city is located is also a port), devoted to purposes of commerce, and on such squares factories are not infrequently built. When plaintiff and her husband located their home there, they might have expected that sooner or later factories would be erected in the neighborhood, and possibly such a plant as the present one. Moreover, when it was decided to locate the plant there, plaintiff raised no objection, but, to the contrary, the decision met with her approval, and it was not until several years after the plant had been erected and had been in operation that she raised any objection. Besides, the city virtually approved the location when it authorized the closing of certain streets for the erection of the plant, a circumstance which it is proper to take into consideration. In these circumstances our opinion is that the injunction should not issue.”
In Walsworth v. Farmers Gin Company, 162 La. 246, 110 So. 338 (1926) the court enjoined the operation of a cotton gin located about 130 feet from plaintiff’s residence until the defendants took measures to prevent the objectionable smoke, soot, cinders, lint, dust, noise and vibration. The decision emphasizes the fact that plaintiffs’ homes were built long before the construction of the cotton gin and ice factory. This is a circumstance to be considered. See also 66 C.J.S. Nuisances pp. 746-747.
Another principle elicited from the jurisprudence is that the rules governing the use of injunctive process to restrain the operation of a business should be strictly construed. An injunction should not be granted except in those cases where the facts are clear and convincing, Woods v. Turbeville, 168 So.2d 915 (2d Cir.1964); Hobson, et al. v. Walker, 41 So.2d 789 (2d Cir.1949).
The principal case relied on by plaintiffs is Ragusa v. American Metal Works, 97 So.2d 683 (La.App.1957) where the owners of residences sought to enjoin the night operations of a plant which manufactured metal products. The evidence showed the plant operated until 12 o’clock at night, five nights a week. The noise of saws cutting metal and the hammering and pounding of metal made it impossible for residents in the area to sleep at night. The court enjoined the operation of this business between the hours of 7:00 p. m. and 7:00 a. m. The decision points out that consideration must be given to such factors as the character of the locality, the nature and intensity of the noises, the effect thereof on persons of ordinary sensibilities, the right of the defendants to use their property for the operation of their business and the right of the plaintiffs to use theirs for residential purposes. The decision is particularly noteworthy for its holding that although the operation of the plant constituted a nuisance during hours of darkness, when it interfered with people’s rest and sleep, it did not constitute a nuisance during the normal working hours of the day.
In applying the above stated principles of law to the facts of the present case, it is necessary to consider separately the shell yard operations of two defendants and the barge operations of the other two. As to the shell yards, the principal noises complained of are the trucks driving to and from the yards, the shell falling from the scoop bucket onto the shell piles and the front-end loader used by Thibodeaux. In a well considered written opinion, the trial judge gave due consideration to most of the factors discussed in the above cited ju *351 risprudence. He mentioned particularly that two shell yards were in operation at substantially this same location when plaintiffs bought their lot and constructed their home in 1957. Although the subdivision in which plaintiffs’ home is located is a beautiful residential area, it is located on a navigable stream which has long been used by barges and tugboats. Commercial and light industrial establishments have existed on the opposite bank of the river for many years and their growth is to be expected. Anyone building a residence in the area should know that such establishments naturally cause a certain amount of noise.
The trial judge found that the equipment used by the shell yards is of the usual type and is in satisfactory condition. He recognized that the “grating noise” made by the front-end loader is annoying but it is no more so than the noise in the Ragusa case, which was permitted during reasonable hours. He found that the shell yards are operated from about 7:00 a. m. until about 5:00 p. m., Monday through Friday, except in emergencies, and he held that this was reasonable under the circumstances. We are impressed with the fact that the trial judge himself went to the scene and listened to these noises from plaintiffs’ premises. He reached the conclusion that the noise from the shell yards does not constitute a nuisance. We find no manifest error in this holding.
As regards the two defendants who operate the barges and tugboats, an additional factor to be considered is that they are lawfully using a navigable river, LSA-C.C. Article 453, and have a right to use the banks to unload their vessels, LSA-C.C. Article 455. Although we do not think a person has the right to use a navigable stream or its banks so as to create a nuisance to property owners, we do find that this is a factor to be considered in determining whether there is a nuisance. For, as stated above, anyone who builds a residence near a navigable river should expect a certain amount of noise from vessels and unloading operations.
The trial judge found as a fact that since the compromise terminating the 1959 suit, the barges are usually secured and the work of the tugboats completed by 9:00 p. m. Furthermore, the unloading operations usually start between 6:00 and 7:00 a. m. and are completed during daylight hours. As stated above, the trial judge personally went to the scene and listened to these unloading operations from plaintiffs’ residence. Considering all of the circumstances, he was of the opinion that the noises were not sufficient to constitute a nuisance that must be enjoined.
Although plaintiffs have presented persuasive evidence that the unloading operations, particularly when the scoop bucket strikes the bottom of the empty barge, constitute a considerable annoyance, we are unable to say that the trial judge committed, manifest error. He not only saw and heard the witnesses, but personally went to the scene and heard the noise complained of.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiffs appellants.
Affirmed.

. Art. 666. Legal private servitudes
Art. 666. The law imposes upon the proprietors various obligations towards one another, independent of all agreements; and those are the obligations which are prescribed in the following articles.
Art. 667. Limitations on use of property
Art. 667. Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.
Art. 668. Inconvenience to neighbor
Art. 668. Although one be not at liberty to make any work by which his neighbor’s buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors’s (neighbor’s) house, because this act occasions only an inconvenience, but not a real damage.
Art. 669. Regulation of inconvenience
Art. 669. If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.